FILED
2010 Nov-23  AM 08:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | |
|---|---|
| **CASSANDRA RENEE NICHOLS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil Action No. CV-08-S-0501-NW** |
| | ) |
| **VOLUNTEERS OF AMERICA,** | ) |
| **NORTH ALABAMA, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Cassandra Nichols, asserts claims against her employer, Volunteers of America, North Alabama, Inc., under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII"), for racial discrimination and disparate treatment, a racially hostile work environment, and retaliation.[1]  Additionally, plaintiff asserts claims against defendant for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the following supplemental state law claims:  slander; invasion of the right of privacy; and negligent and/or wanton training, supervision, and retention.[2]

This case is before the court on defendant's motion for summary judgment as

---

[1] *See* doc. no. 1 (Plaintiff's Complaint).

[2] *See id.*

to all of plaintiff's claims,[3] and its motion to strike the testimony of various employees of defendant.[4]  In her response brief, plaintiff conceded:  "Defendant's Motion for Summary Judgment is due to be granted on Nichols' claims of slander, invasion of the right of privacy, and her claim under the ADA."[5]  Upon consideration of plaintiff's remaining claims in light of the parties' briefs and evidentiary submissions, the court concludes that defendant's motion for summary judgment is due to be granted in full.  Defendant's motion to strike will be denied as moot.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In making this determination, the court must review all evidence and make all

---

[3] Doc. no. 43 (Defendant's Motion for Summary Judgment).

[4] Doc. no. 50 (Defendant's Motion to Strike).

[5] Doc. no. 46, at 2.

reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).   Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation."  *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  SUMMARY OF FACTS

Plaintiff, Cassandra Renee Nichols ("Nichols"), is an African-American ("black") female who began working for Volunteers of America, North Alabama, Inc.

("VOA") in June of 2005 as a so-called "House Manager I" in Florence, Alabama.[6]

VOA is a faith-based, human services organization that provides material and spiritual assistance to those in need.[7]   Specifically, VOA provides services for families, children, people with disabilities, alcoholics, drug abusers, criminal offenders and ex-offenders, and the elderly.[8]   Sonja King, a black female, served as Nichols's[9] immediate supervisor.[10]   Teresa Stephenson, a white female and the

---

[6] *See* defendant's evidentiary submission, Exhibit A (Deposition of Cassandra Nichols), at 38; plaintiff's evidentiary submission, Exhibit B (Declaration of Cassandra Nichols), at 1-4.  Plaintiff should consider herself fortunate that this court does not strike her entire brief for blatant and pervasive noncompliance with the Uniform Initial Order entered by this court on May 12, 2008.  *See* doc. no. 6.  That order specifically mandates that:

> [a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based.  *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

Doc. no. 6, at 16 (emphasis in original).  Plaintiff provides two varieties of responses to defendant's statements of fact.  The first is an unexplained, outright denial together with a "shotgun" citation to the record.  For example, defendant provides a pinpoint citation and states: "When Hester asked Nichols why there was time manually added to her 'E-time' report, Nichols acknowledged that she may not have worked those hours."  Doc. no. 44, at 3, ¶ 5.  Plaintiff's response is:  "Nichols denies the allegations of paragraph 5 *for the reasons stated at pp. 23-46* of her July 19, 2010 Declaration, Exhibit 'B' hereto."  Doc. no. 47, at 2, ¶ 5 (emphasis supplied).  Plaintiff's alternative method of response is a blanket denial of defendant's statement of fact with no citation to the record whatsoever.  *See, e.g.*, doc. no. 47, at 3, ¶ 14 ("Nichols denies the allegations in paragraph 14.").  Each of these responses violates the Uniform Order and places the burden on the court to sift through plaintiff's purported evidence and assess the viability of her claims.

[7] *See* Nichols Deposition, Exhibit A(22), at 5.

[8] *See id.*

[9] The court acknowledges that the proper possessive form of "Nichols," at least according to conventional wisdom, is "Nichols's."  *See* Bryan A. Garner, *The Elements of Legal Style* 20 (2d ed. 2002) ("Form singular possessives by adding 's to the singular form of the noun.  The rule holds

Program Director in the Florence, Alabama office, supervised Ms. King.[11] Stephenson reported only to VOA's Chief Executive Officer, Victor Tucker, who is a white male.[12]

As a "House Manager I," Nichols earned $7.69 per hour.[13]  In February 2006, she was promoted to "House Manager II."[14]  In that position, VOA entrusted Nichols with supervisory responsibilities and increased her pay to $8.50 per hour.[15]  It was "basically an office job and [did] not require the physical labor the House Manager I job require[d]."[16]  Sonja King remained Nichols's direct supervisor, but Nichols was also subordinate to a number of other VOA employees, including the following persons:  Amy Johnson, Sarah Rickard, Carrie Rickard, and Debra Williamson.[17] "Even though Sonja D. King was supposed to be [Nichols's] immediate supervisor, Sarah Rickard and Amy Johnson told [her] what to do."[18]

---

true regardless of how the word ends:  thus, *witness's*, *Jones's*, *Congress's*, and *testatrix's*.").

[10] Nichols Deposition, at 38, 42-43.

[11] *Id.* at 42-44.

[12] *See, e.g.*, defendant's evidentiary submission, Exhibit B (Affidavit of Victor Tucker), ¶¶ 13, 17; Nichols Declaration, at 8 ("Teresa Stephenson told me that as the Program Director at [VOA's] facilities and operations in Florence, Alabama, if she wanted me to have the job, Victor Tucker would do what she wanted him to do.").

[13] Nichols Declaration, at 9.

[14] Nichols Deposition, at 43.

[15] *Id.* at 43-44, 57-58; Nichols Declaration, at 9.

[16] Nichols Declaration, at 4-5.

[17] *Id.* at 11-12.

[18] *Id.*

In September of 2006, a VOA accountant became suspicious of the work time reported by Nichols.  VOA uses an "E-time" system to monitor its employees' work hours.[19]  Employees must call a designated telephone in order to "clock-in" and "clock-out."[20]  The time of each call is electronically recorded, and VOA pays its employees according to the time reports generated by the system.[21]  The "E-time" system had, at least initially, "glitches."[22]  "When the system was new . . . [s]ometimes [it] would report 'clock-in' times as 'clock out' times, and report the times on the wrong date."[23]  However, "while the system may record the times *in the wrong order*, the system typically does not record the wrong times."[24]  VOA's Accounting Supervisor, Susan Hester, noticed that Nichols manually edited the times reported by the system.[25]  "For instance, on the afternoon of September 7, 2006, Ms. Nichols's E-time report indicated that she clocked out at 2:57 p.m., but the report was edited to show she clocked out at 5:00 p.m."[26]  Nichols added extra hours and,

---

[19] Nichols Deposition, at 96-97.

[20] *Id.*

[21] *Id.*

[22] Defendant's evidentiary submission, Exhibit E (Affidavit of Susan Hester), ¶ 5.

[23] *Id.*

[24] *Id.* ¶ 7 (emphasis supplied).

[25] *Id.* ¶¶ 6-8.

[26] *Id.* ¶ 7.

consequently, received extra pay on numerous occasions.[27]  Susan Hester reported these findings to Human Resources.[28]

When Victor Tucker learned of Nichols's manual edits, he placed her on administrative leave, pending an investigation into the matter.[29]  Mr. Tucker sent Nichols a letter on October 3, 2006, explaining his decision, and also informing her that she was prohibited — pursuant to standard company policy — from communicating with VOA staff members during this period.[30]  Nichols was aware of the leave determination prior to receiving Mr. Tucker's letter, however.  "[Teresa] Stephenson had already told [Nichols] that *she* had made the decision to put [her] on administrative leave."[31]  Indeed, according to Nichols, "Stephenson made most, if not all, of the hiring, discipline, and firing recommendations and decisions at [VOA] facilities and operations in Florence, Alabama," and Victor Tucker would "rubber stamp" anything submitted to him by Ms. Stephenson.[32]  Mr. Tucker disputes this

---

[27] *E.g.*, Nichols Deposition, Exhibit A(29).

[28] Hester Affidavit, ¶¶ 6, 10.

[29] Tucker Affidavit, ¶¶ 5-10; defendant's evidentiary submission, Exhibit C (Affidavit of Corida Bolden), ¶¶ 7-12.

[30] Nichols Deposition, at 81-82 & Exhibit A(6) ("We ask that you not return to any of the facilities operated by this agency for any reason.  We also ask that you not have any further contact with it's [sic] consumers/residents and staff while in the employment of this agency.  Any contact you make should be with the Human Resource Department of [VOA].").

[31] Nichols Declaration, at 24 (emphasis supplied).

[32] *See*, *e.g.*, Nichols Declaration, at 7-8.  The court is confounded as to how Teresa Stephenson can be both the sole "decider" and "recommender" at VOA.  Nevertheless, the court will

allegation and testified that he independently made all of the relevant employment decisions in this action, and that "[a]s CEO, [he] alone exercises[s] the authority to demote employees."[33]

Nichols "emphatically" denies that she engaged in misconduct that constituted "stealing time."[34] She also claims that she has "personal knowledge of two [white] employees similarly situated to her."[35] According to Nichols, "Rebecca Hallmark, Teresa Stephenson's mother who worked at [VOA], and Amy Johnson, Sarah Rickard's daughter who was [a House Manager II], . . . were guilty of 'stealing time.'"[36] Clarifying her inculpation of Ms. Hallmark and Ms. Johnson, Nichols stated that these employees were "paid for time they did not actually work for [VOA]," but not disciplined.[37]

On November 8, 2006, VOA reinstated Nichols, finding insufficient evidence that her manual edits constituted "stealing time."[38] The investigation, however, revealed that Nichols violated several company policies, both before and during the

---

recite the facts as laid out by plaintiff.

[33] *See* Tucker Affidavit, ¶¶ 3, 5-15.

[34] *See, e.g.*, Nichols Declaration, at 35-36.

[35] *Id.* at 31.

[36] *Id.*

[37] *Id.*

[38] Nichols Deposition, at 126; Bolden Affidavit, ¶ 10 (stating that the results of the investigation were inconclusive).

administrative leave period.[39]  As a result, VOA issued written reprimands to Nichols contemporaneously with her reinstatement.  Nichols was reprimanded in writing for manually editing her time entries without proper approval.[40]  Nichols was also reprimanded for admittedly communicating with VOA staff while she was on administrative leave in violation of company policy and Victor Tucker's specific instructions.[41]  VOA's inspection further revealed that Nichols had been improperly, and excessively, using her company-issued cell telephone for personal matters.[42]  This infraction was corroborated by the company's telephone records and Nichols's own admission.[43]  Accordingly, she was reprimanded for this misconduct as well.[44]

On various unspecified dates, Nichols reported to Sonja King, her immediate supervisor, that VOA staff members, especially Teresa Stephenson, were discriminating against her and subjecting her to a racially hostile work environment.[45] Nichols felt that Stephenson made false statements about her "E-time" report entries in order to have her placed on administrative leave and eventually demoted.[46]

---

[39] Nichols Deposition, at 93-110.

[40] Nichols Deposition, at 93 & Exhibit A(7).

[41] Nichols Deposition, at 99-100 & Exhibits A(8), (22).

[42] Nichols Deposition, at 107-109 & Exhibit A(10).

[43] *See id.*

[44] *See id.*  Stephenson instructed Nichols not to use her company cell telephone for personal reasons on several occasions before Nichols received this reprimand.  *Id.*

[45] Nichols Declaration, at 14-17.

[46] *Id.* at 23.

Nichols also claims to have reported racial discrimination and harassment to VOA Human Resources staff members Corida Bolden and Robin Bucklin.[47]   The parties dispute this fact, as both Ms. Bucklin and Ms. Bolden deny that Nichols reported to them any dissatisfaction with her work environment.[48]   In her declaration, Nichols claims that she *sought* to communicate "the situation" to Victor Tucker.[49]   However, Nichols does not claim that any such communication actually occurred, nor does the record support a finding that Mr. Tucker had knowledge of Nichols's complaints.[50] According to Nichols, Teresa Stephenson learned about these reports and informed her that "anybody who reported claims of racial discrimination or racial harassment to Victor Tucker or human resources would 'be sorry.'"[51]

On December 9, 2006, Victor Tucker demoted Nichols from House Manger II to House Manager I, and reduced her pay accordingly.[52]   Mr. Tucker's proffered

---

[47] *Id.* at 14-17.

[48]   *See* Bolden Affidavit, ¶ 14 ("Neither Ms. Nichols nor Ms. Sonja King ever complained to me about any type of unlawful discrimination or harassment.  Nobody has ever complained to me that Teresa Stephenson, Sarah Rickard, Amy Johnson, Carrie Rickard, Melissa Castle or Robin Bucklin discriminated against them or harassed them because of their race, age, religion, or disabilities.").

[49] Nichols declaration, at 14-16. ("I told both Cordia Bolden and Robin Bucklin that I wanted to talk to Victor Tucker about all of this.  They told me they would have Victor Tucker call me.  Every time I called either Cordia Bolden or Robin Bucklin, they told me they would talk to Victor Tucker or would put me off.  Victor Tucker never called me.").

[50] Nichols Deposition, at 181-82, 213-14; Nichols Declaration, at 14-16.

[51] Nichols Declaration, at 15.

[52] *See* Tucker Affidavit, ¶¶ 11-14.

reasons for the demotion included the misconduct for which Nichols received written reprimands upon reinstatement.[53]   Melissa Castle, a white female with allegedly less experience than Nichols, filled the vacant House Manager II position.[54]

Several months later, on April 20, 2007, Nichols filed charges of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").[55] The EEOC mailed Nichols's Dismissal and Right to Sue Letter on December 21, 2007.[56]   Nichols continued working as House Manager I until she took a leave of absence for medical reasons.[57]   On March 17, 2008, Nichols informed VOA that she was physically unable to return to work.[58]   Nichols then filed this action against VOA on March 21, 2008.[59]   VOA currently maintains Nichols on "relief status," and she is eligible to work for the agency on an "as needed" basis.[60]

### III.  DISCUSSION

**A.   Plaintiff's Race-Related Claims Under 42 U.S.C. § 1981 and Title VII**

**1.      Abandonment of racially hostile work environment claim**

---

[53] *Id.*

[54] Nichols Declaration, at 23-24.

[55] Doc. no. 1, Exhibit A.

[56] *Id.* at Exhibit B.

[57] Nichols Deposition, at 297-98.

[58] *Id.*

[59] *See* doc. 1, at 1.

[60] *See* defendant's evidentiary submission, Exhibit D (Affidavit of Robin Bucklin), ¶ 8.

At the summary judgment stage, plaintiff has effectively abandoned her claim for a hostile work environment. Plaintiff offered no response to defendant's well-supported arguments that summary judgment should be granted on that claim. Issues and contentions not raised in a party's response brief are deemed abandoned. *See, e.g.*, *Chapman*, 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."). *Cf. Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on [her] pleadings to avoid judgment against [her]. There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned . . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted).

12

It is not sufficient for Nichols to merely mention the words "harassment" and

"hostile work environment" randomly throughout her response brief.[61]   Equally

insufficient is Nichols's statement at the beginning of her "Argument" section that

she "was subjected to severe and pervasive racially derogatory language and received

discriminatory and retaliatory discipline, including being demoted, put on

administrative leave, stripped of her higher hourly wage, and constructively

discharged."[62]   At no point in her response brief does Nichols actually address her

hostile work environment claim — to the extent that she even alleged this claim in

_____

[61] *See* doc. no. 47 (Plaintiff' Response Brief, Table of Contents).  Plaintiff uses the words "hostile work environment" in the following headings in her response brief:  "Plaintiff Has Direct Evidence of Discrimination/Harassment/Hostile Working Environment," "Plaintiff Has Sufficient Evidence to Support her Claim of Race Discrimination/Harassment/Hostile Working Environment," and "Plaintiff Can Prove a *Prima Facie* Case of Race Discrimination/Harassment/Hostile Working Environment."  *See id.*  Despite these headings, plaintiff fails to address any hostile work environment claim she may have in these misleadingly labeled sections.  Plaintiff does use the word "hostile work environment" and "harassment" at a few other points in her response brief, *see* doc. no. 47, at 25, but she fails to actually discuss the claim.

To clarify what should be obvious, a hostile work environment claim is distinct and separate from a discrimination and disparate treatment claim.  Unlike the latter, a plaintiff alleging a racially hostile work environment must demonstrate that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  To meet this burden, a plaintiff must show:  (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as the plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) the employer is responsible for such environment under a theory of either vicarious or direct liability.  *Id.*; *see also*, *e.g.*, *Freeman v. City of Riverdale*, 330 Fed. Appx. 863, 864 (11th Cir. 2009).

[62] Doc. no. 47, at 21.

her muddled complaint[63] — despite VOA's well-articulated and properly supported arguments that the purported hostile work environment was neither severe nor pervasive, and that Nichols did not reasonably avail herself of VOA's anti-harassment policies.[64]

The court will not give consideration to arguments that are not fully developed or bolstered with legal authority. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)). *See also Lyes v. City of Riviera Beach, Florida*, 126 F.3d 1380, 1388 (11th Cir. 1997) (explaining that "the onus is upon the parties to formulate arguments"); *Resolution Trust Corp. v. Dunmar*

---

[63] *See* doc. no. 1. Plaintiff set forth her race-related claims in Count I of her complaint, which states as follows:

       This is an action under Title VII of the Civil Rights Act of 1964 and Title I of the Civil Rights Act of 1991 to correct unlawful employment practices on the basis of race and retaliation and to provide appropriate relief to Cassandra Renee Nichols ("Nichols") who was adversely affected by such practices. The defendant employer, namely, Volunteers Of America, North Alabama, Inc. ("VOA"), doing business in Florence, Lauderdale County, Alabama, discriminated against Nichols on the basis of her race (Black) and retaliated against her for her engaging in activity protected by Title VII by subjecting her to harassment, unfair discipline, suspension, termination, and other different terms and conditions of employment as set forth in this complaint.

Doc. no. 1, at 1.

[64] *See* doc. no. 44, at 23-32.

14

*Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it"). Accordingly, VOA is entitled to summary judgment on Nichols's hostile work environment claim.

### 2.      Direct evidence of discrimination

Title VII and 42 U.S.C. § 1981 make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race. *See* 42 U.S.C. §§ 1981, 2000e-2(a). A plaintiff may establish a *prima facie* case of discrimination through either direct or circumstantial evidence. *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999). Nichols first argues that there is direct evidence of discrimination in this case. To support this argument, Nichols offers only the following allegations, without a single citation to the record:

> The evidence here, established by both Nichols's and Kings' testimony, shows that Stephenson, S. Richard, Johnson, C. Rickard, and Castle regularly exhibited racially discriminatory conduct, including using racial epithets. Stephenson, S. Rickard, Johnson, C. Rickard, and Castle used the word "nigger" on multiple occasions. Nichols and King complained about Stepheson's [sic], S. Rickard's, Johnson's, C. Rickard's, and Castle's discriminatory conduct to supervisory and

Human Resources personnel.  However, no action was taken to stop the racial discrimination and racial harassment, and nothing was done about the hostile working environment at [VOA].

Stephenson, S. Rickard, and Johnson made false statements, in writing and verbally, regarding Nichols and had other [VOA] employees make false statements about Nichols and compose false written statements about Nichols which were utlilized [sic] to place Nichols on administrative leave, to demote her, and to reduce her pay.[65]

Direct evidence of discrimination exists only in rare cases.  *See, e.g., United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *see also* I Barbara Lindeman & Paul Grossman, *Employment Discrimination Law* 11 (4th ed. 2007) ("Because direct evidence of discrimination, such as an admitted policy or practice of treating protected class members differently, is rare, case law has largely focused on when to infer a defendant's discriminatory intent from circumstantial evidence.").  The Eleventh Circuit defines direct evidence "as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Damon*, 196 F.3d at 138 (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir. 1998)) (internal quotation marks omitted).  "[T]he evidence must indicate that the complained-of employment decision was motivated by the decision-maker's

---

[65] Doc. no. 47, at 25.

16

[racial animus]." *Damon*, 196 F.3d at 1358-59 (citing *Early v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990)); *see also Williamson v. Adventist Health System/Sunbelt, Inc.*, 372 Fed. Appx. 936, 940 (11th Cir. 2010). To qualify as direct evidence of discrimination, the Eleventh Circuit requires that a biased statement by a decisionmaker be made concurrently with the adverse employment event, such that *no inference is necessary* to conclude that the bias necessarily motivated the decision.  *See Damon*, 196 F.3d at 1359 (noting that "only the most blatant remarks, whose intent could be nothing other than to discriminate" constitute direct evidence); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004) (explaining that direct evidence is "evidence that, if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir. 1999) (same) (quoting *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997)).

Curiously, the facts relied upon by Nichols actually negate her argument that this is a direct evidence case.  The only allegation made by Nichols that relates to an adverse employment action indicates that such action was due to "false statements . . . which were utlilized [sic] to place Nichols on administrative leave, to demote her, and to reduce her pay."[66]  These "false statements" were simply suspicions that

---

[66] *Id.*

Nichols was "stealing time" by manually altering the hours she worked on her electronic time cards. Such acts had nothing to do with the plaintiff's race.[67] Nichols has, therefore, failed to direct this court's attention to any direct evidence establishing that the complained-of employment decisions were made with a racially discriminatory animus. Even though it is under no obligation to do so,[68] the court has conducted its own review of the record, and was also unable to find any direct evidence of discrimination.

Additionally, statements by those who are not decisionmakers cannot constitute direct evidence of an improper motivation on the part of an employer. *See, e.g., Standard v. A.B.E.K. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Berman v. Orkin Exterminating*, 160 F.3d 697, 701 (11th Cir. 1998); *Evans v. McCalin of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997). Victor Tucker, CEO of VOA, testified that he independently made the decisions about which Nichols complains, *i.e.*, Mr. Tucker was the "decisionmaker."[69] Conceding that there is no evidence of direct discrimination by the actual decisionmaker in this case, Nichols attempts to

---

[67] Nichols Declaration, at 17-18.

[68] The court is allowed to rely upon the facts and issues set out by the parties, and is not required itself to search through all of the parties' evidentiary submissions. *See Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

[69] Tucker Affidavit, ¶¶ 3, 5-15.

advance a "cat's paw theory."[70]  The issue of whether Victor Tucker was a "cat" who utilized Teresa Stephenson as his "paw," or *vice-versa*, is irrelevant, because there is no direct evidence that anyone, *neither Stephenson nor Tucker*, discriminated against Nichols.  The matter, therefore, warrants no further consideration by the court.

### 3.    Circumstantial evidence of discrimination

Nichols next argues, as an alternative to her direct evidence theory, that she has presented sufficient circumstantial evidence of discrimination.[71]  Title VII makes it unlawful for an employer to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a).  Claims of race

---

[70] When a supervisor who manifested a discriminatory animus toward the plaintiff, and the decisionmaker who ultimately inflicted the adverse employment action complained of, are not one and the same, plaintiffs sometimes attempt to supply the missing link in the causal chain through use of the so-called "cat's paw" theory. *See, e.g.*, *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."); *Bernstein v. Sephora*, 182 F. Supp. 2d 1214, 1218 (S.D. Fla. 2002) ("[W]here the titular decisionmaker is no more than a cat's paw, courts have looked beyond the formal structure of the decisionmaking process and held defendant companies liable for the invidious bias of the de facto decisionmaker.") (citing *Llampallas*, 163 F.3d at 1249; *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)).

[71] Doc. no. 47, at 29.

discrimination under § 1981 are analyzed in the same manner as disparate treatment claims brought under Title VII. *See Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000) ("The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."); *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that, because Title VII and § 1981 have the same requirements of proof and use the same analytical framework, the court should analyze race discrimination claims under both laws simultaneously); *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.").

Where, as here, the plaintiff seeks to prove intentional discrimination by using circumstantial evidence to show intent, the court must analyze the case using the burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that now familiar framework, the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonable fact-finder to determine that she has satisfied the elements of a *prima facie* case. *Id.* at 802. To make out a *prima facie* case of disparate treatment and discrimination, the plaintiff

20

can show that: (1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably than she was treated; and (4) she was qualified to perform the duties of her job. *E.g., Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006).

The parties, at least implicitly, agree that Nichols is qualified to perform the duties of her job, as well as a member of a protected class. Regardless, as a VOA employee who has been with the company for several years, Nichols was presumptively qualified for either of the positions to which she was assigned. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001) (finding plaintiff's time in the job sufficient for the court to infer that plaintiff was qualified for the purpose of establishing *prima facie* case of racial discrimination). Moreover, the court accepts, and the parties apparently do not dispute, Nichols's implied assertion that both her unpaid administrative leave and the demotion constitute "adverse employment actions" for the purposes of establishing a *prima facie* case of disparate treatment. *See Davis v. Town of Lake Park, Florida*, 245 F.3d 1232, 1238-39 (11th Cir. 2001) (noting that an adverse employment action can arise out of the economic consequences of an employer's decision).

However, Nichols has failed to present sufficient evidence that VOA "treated

21

similarly situated employees outside of [her] protected class more favorably than [s]he was treated." *See Burke-Fowler v. Orange County*, 477 F.3d 1319, 1323 (11th Cir. 2006). "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). The Eleventh Circuit requires "that the quantity and quality of the comparator's misconduct be *nearly identical* to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler*, 477 F.3d at 1323 (quotation marks and citations omitted) (emphasis supplied).

The court finds Nichols's attempt to create a fact dispute with little more than bald assertions unavailing. Nichols's evidence of comparators regarding her administrative leave consists of the following statement by Nichols, which is repeated numerous times, with no further explanation, throughout her declaration:

> I have personal knowledge of two employees similarly situated to me, Rebecca Hallmark, Teresa Stephenson's mother who worked at [VOA], and Amy Johnson, Sarah Rickard's daughter, who were guilty of "stealing time" . [sic] Both of them were paid for time they did not actually work for [VOA]. Teresa Stephenson was not disciplined or fired for her mother's [sic] being paid for time she did not work. Rebecca Hallmark was not disciplined or fired for being paid for time she did not actually work for [VOA]. Amy Johnson was not disciplined

22

or fired for being paid for time she did not actually work for VOA.[72]

Putting aside the question of whether this statement even qualifies as evidence, the facts alleged, assuming they are true, are insufficient to support a *prima facie* case of disparate treatment with respect to VOA placing Nichols on administrative leave. Nichols essentially alleges that she has "personal knowledge" that VOA employees were paid for hours they did not work, and this went unaddressed. The record, however, does not support a finding that Victor Tucker, the relevant decisionmaker, suspected that Ms. Hallmark or Ms. Johnson were "stealing time." Nichols does not claim that she reported the matter, and she has further failed to produce any evidence that these employees were accused of stealing time by anyone other than Nichols in her declaration.

Nichols, conversely, claims that she was actually accused by multiple VOA employees of stealing time.[73] Moreover, unlike Rebecca Hallmark or Amy Johnson, allegations that Nichols was stealing time were tied to direct, specific conduct by Nichols, rather than vague, unsupported finger-pointing. Nichols admittedly manually altered her "E-time" reports, which justifiably raised suspicions.[74] Also unlike VOA employees cited as "similarly situated" to Nichols, the suspicions that

---

[72] Nichols Declaration, at 18, 31, 35-36, 41.

[73] *E.g.*, Nichols Declaration, at 17; *see also* doc. no. 47, at 25.

[74] Nichols Declaration, at 44.

Nichols was stealing time were actually reported to a relevant decisionmaker, Victor Tucker.[75] Finally, and perhaps most telling, is the implication behind Nichols's so-called evidence. In sum and substance, Nichols's statement supports, at most, the presence of a "family perk" system at VOA. Neither Title VII nor 42 U.S.C. § 1981 protect Nichols from less favorable treatment due to her status as "not a family member" of Teresa Stephenson or Sarah Rickard. "Title VII was never intended to protect employees from all unpleasant and rude conduct in the workplace." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999). Instead, "[i]t is an *anti-discrimination* statute." *Id.* at 1253-54 (emphasis supplied). Nichols has failed to produce sufficient evidence that unprotected employees were involved in or accused of nearly identical conduct but treated differently than her. *See Maniccia*, 171 F.3d at 1368. Therefore, Nichols has not established a *prima facie* case with respect to her administrative leave.

The same is true regarding Nichols's demotion. The record contains no evidence, and Nichols does not bother to allege in her response brief, that VOA treated a similarly situated employee outside of her protected class more favorably than she was treated. *See Burke-Fowler*, 447 F.3d at 1323. VOA's investigation into Nichols's work hours revealed multiple violations of company policies for which she

---

[75] Tucker Affidavit, ¶¶ 5-15; Hester Affidavit, ¶ 10.

received written reprimands.  Nichols does not allege that any non-protected VOA employee received written reprimands and was treated more favorably, nor does the record support such a conclusion.  "[A]bsent some other similarly situated but differently disciplined worker, there can be no disparate treatment."  *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 1999) (citing *Jones v. Gerwens*, 874 F.2d 1534  (11th Cir. 1989)).  Nichols has failed to establish a *prima facie* case of disparate treatment and racial discrimination, and VOA is, therefore, entitled to summary judgment on these claims.

Regardless, even if the court deemed that Nichols had established a *prima facie* case, VOA has proffered legitimate, non-discriminatory reasons for taking the relevant adverse employment actions.  Once a *prima facie* case is established, the burden shifts to the defendant to rebut the resulting presumption of discrimination by producing evidence that it acted for a legitimate, non-discriminatory reason. *McDonnell Douglas*, 411 U.S. at 802.  This burden is "exceedingly light."  *Meeks v. Computer Associates, International*, 15 F.3d 1013, 1021 (11th Cir. 1994).  VOA need not persuade this court that it was actually motivated by the proffered reason, but need only present evidence raising a genuine issue of fact as to whether it discriminated against Nichols.  *Texas Department of Community Resources v. Burdine*, 450 U.S. 248, 254 (1981).

25

VOA would undoubtedly meet this "exceedingly light" burden.  Mr. Tucker alleged that he made the decision to place Nichols on administrative leave and, ultimately, to demote her from House Manager II to House Manager I, for several reasons:  (1) Nichols's hand-written time entries on her "E-time" reports; (2) her contact with VOA staff members while on administrative leave, a violation of VOA's policies and Mr. Tucker's specific instructions; and (3) the excessive use of her company-issued cell telephone for personal calls.[76]

Once a defendant carries its burden of producing "admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," *Texas Department of Community of Affairs v. Burdine*, 450 U.S. 248, 257 (1973), then the "rebuttable presumption" of discrimination created by the demonstration of a *prima facie* case[77] is refuted, "drops from the case," and "the factual inquiry proceeds to a new level of specificity."  *Id.* at 255 & n.10.

In this final step of the analytical process, the burden shifts back to the plaintiff to "come forward with evidence . . . sufficient to permit a reasonable factfinder to

---

[76]Tucker Affidavit, ¶¶ 12-14; *see also* Nichols Deposition, at 93, 99-100, 107-09 & Exhibits (A)6-8, 10.

[77]*See Burdine*, 450 U.S. at 254 n.7 (explaining that, in the *McDonnell Douglas* context, the phrase "*prima facie* case" is used to "denote the establishment of a legally mandatory, rebuttable presumption [of discrimination]").

conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but merely a pretext for intentional discrimination. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804)); *see also Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004) ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Quarreling with that reason is not sufficient.") (internal citation omitted).  The plaintiff shoulders this burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1528 ( citation omitted); *see also Silvera v. Orange County School Board*, 244 F.3d 1253, 1258 (11th Cir. 2001).

Despite Nichols's vehement claims that Victor Tucker's decisions were pretextual, she has produced no evidence to support her assertion.  Nichols's proffered "evidence" consists of nothing more than conclusory and speculative statements such as:  (1) "Teresa Stephenson falsely accused me of 'stealing time' so she could replace me as [House Manager II] with a white person;"[78] (2) "The

---

[78] Nichols Declaration, at 23.

determination to demote me and to reduce my pay was made by Teresa Stephenson solely because I am black;"[79] (3) "I was placed on administrative leave so [Stephenson] could replace me with Melissa Castle who is white;"[80] and (4) "Stephenson . . . made the decision to replace me with Melissa Castle who is white because she wanted a white person to have my [House Manager II] position."[81] Naked allegations do not establish pretext and will not defeat a motion for summary judgement. *See, e.g.*, *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination."). Thus, even if Nichols managed to establish a *prima facie* case, VOA would still be entitled to summary judgment on Nichols's discrimination claims.

## B.     Plaintiff's Retaliation Claims Under 42 U.S.C. § 1981 and Title VII

Nichols also claims that she was retaliated against for reporting the alleged racial harassment and discrimination. Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."

---

[79] *Id.* at 7.

[80] *Id.* at 30.

[81] *Id.*

42 U.S.C. § 2000e-3(a).  To establish a claim of retaliation under Title VII or § 1981, a plaintiff must prove that (1) she engaged in statutorily protected activity, (2) she suffered a materially adverse action, and (3) there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

In the absence of direct evidence of retaliatory motive, the *McDonnell Douglas* burden shifting analysis applies.  *See*, *e.g.*, *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  Under that formulation, "[i]f the plaintiff makes out a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." *Id.*  "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

Nichols's argument on the issue of retaliation is not entirely clear because she offers various conclusions as to what motivated the decisions leading to her alleged adverse employment actions.  For example, Nichols avers that she was put on administrative leave and, ultimately, demoted due to false accusations that she was stealing time.[82]  If Nichols proceeds on this theory, there is, of course, no causal

---

[82] *See, e.g.*, doc. no. 47, at 25.

connection between protected conduct and an adverse employment action.  However, Nichols also alleges that the leave and demotion was due to Teresa Stephenson's desire to have a white employee in the House Manager II position.[83]  Nichols, however, does not refer to precisely *what evidence* makes it so "clear that Nichols has established her claim of unlawful retaliation."[84]   Instead, Nichols merely refers to "the evidence" and states that it "provides numerous grounds upon which a reasonable jury could find [VOA's] reasons for demoting Nichols, reducing her pay, stripping her of her supervisory duties and responsibilities, and giving her job to a white, less qualified employee was [sic] mere pretext for unlawful retaliation."[85]  Upon sifting through the record and reviewing Nichol's purported facts, the court is unable to locate "the evidence" to which Nichols refers.

Nichols claims that she reported the alleged racial discrimination and harassment to Sonja King, her direct supervisor, and VOA human resources staff members Corida Bolden and Robin Bucklin.[86]  Ms. Bucklin testified that no such complaints were made.[87]  Moreover, Ms. Bolden, *a black female herself*, categorically

---

[83] *E.g.*, Nichols Declaration, at 23.

[84] Doc. no. 47, at 34.

[85] *Id.*

[86] Nichols Declaration, at 14-17.

[87]Bucklin Affidavit, at ¶¶ 5-6.  Specifically, Bucklin testified as follows:

Nobody has ever complained to me that Teresa Stephenson, Sarah Rickard,

denies having ever received any such complaints.[88]   Nevertheless, the court must consider as true Nichols's claim that she made these various complaints of discrimination.   Even so, there is insufficient evidence that Victor Tucker, the individual who made all of the relevant adverse employment decisions in this action, was aware of these alleged complaints of discrimination prior to making the adverse employment decisions.[89]   Although otherwise unsupported by the record, Nichols

---

Amy Johnson, Carrie Rickard, Melissa Castle, Cordia Bolden or Victor Tucker discriminated against them or harassed them because of their race, age, religion or disabilities.

During my employment with [VOA], I have spoken frequently with managers at [VOA's] Florence, Alabama facilities.   I also have visited the Florence facilities and observed [VOA] employees.   Based on my personal experiences, I have not observed or been made aware of any wrongful or unlawful misdeeds of Teresa Stephenson.   More specifically, I have not observed or been made aware of any instance in which Ms. Stephenson engaged in racially discriminatory or harassing behavior.

*Id.*

[88] *See* Bolden Affidavit, ¶¶ 1, 14 ("Neither Ms. Nichols nor Ms. Sonja King ever complained to me about any type of unlawful discrimination or harassment.   Nobody has ever complained to me that Teresa Stephenson, Sarah Rickard, Amy Johnson, Carrie Rickard, Melissa Castle or Robin Bucklin discriminated against them or harassed them because of their race, age, religion, or disabilities.").

[89] The court begrudgingly does so considering Nichols's deposition testimony in which she stated as follows:

Q.      You told me about going down to Huntsville and being in the van and understanding that Sonja [King] was going to go in and report something. I'm asking you: What, if anything –

A.      Did I hear it?

Q.      -- did you hear?  Yes.

claims in her declaration that she attempted to communicate "the situation" to Mr. Tucker.[90]   However, Nichols does not claim to have actually accomplished such communication.[91]   Indeed, Mr. Tucker — along with other members of VOA's Human Resources Department[92] — denies having ever heard a complaint of discrimination by Nichols.[93]   Having failed to show that the actual decisionmaker

---

A.   I wasn't – I was in the van.

Q.   Okay.  Now I'm asking you any other time.  Did you ever hear Sonja or anyone else report to HR that you or anyone else was being racially harassed?

A.   No.  I mean, what's the sense of going to report it?  I mean, nothing was going to be done about it.

. . . .

Q.   Did you, Ms. Nichols, ever put anything in writing to anyone in HR or to Mr. Tucker about racial harassment?

A.   No.  Because I meant, the – policy and procedure book, I mean, it's there.  But like I say, you report it.  Nothing is going to be done about it.  So that's why I didn't.  I just talked – whatever I had a complaint about, I talked to Sonja [King] about it.  And she told me she would deal with it.

Nichols Deposition, at 180, 182; *see also id.* at 213.

[90] Nichols Declaration, at 14-16 ("I told both Cordia Bolden and Robin Bucklin that I wanted to talk to Victor Tucker about all of this.  They told me they would have Victor Tucker call me.  Every time I called either Cordia Bolden or Robin Bucklin, they told me they would talk to Victor Tucker or would put me off.  Victor Tucker never called me.").

[91] Nichols Declaration, at 14-16; Nichols Deposition, at 181-82, 213-14.

[92] *See* Bolden Affidavit, ¶ 14; Bucklin Affidavit, ¶¶ 5-6.

[93] Tucker Affidavit, ¶ 17 ("Based on my personal experiences, I have not observed or been made aware of any wrongful or unlawful misdeeds of Teresa Stephenson.  More specifically, I have not observed or been made aware of any instance in which Ms. Stephenson engaged in racially discriminatory or harassing behavior.").

was aware of complaints of discriminatory treatment, Nichols cannot establish a case of retaliation.  *See, e.g.*, *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, *at a minimum*, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.") (emphasis supplied).

Even if Nichols could establish a *prima facie* case of retaliation, she has offered no evidence that defendant's legitimate, non-discriminatory reasons for placing her on leave and demoting her were mere pretext.  As explained more fully above, Nichols offers only conclusory statements, speculating that she was demoted "solely because [she is] black."[94]  Accordingly, VOA is entitled to summary judgment on Nichols's retaliation claim.

## C.   Plaintiff's Claim for Negligent and/or Wanton Training, Supervision, and Retention

Nichols bases her negligent and/or wanton hiring, training, supervision, and retention claim on allegations of racial discrimination and harassment against Teresa Stephenson.  "In order to establish a claim against an employer for negligent supervision, training, and/or retention, the plaintiff must establish that the allegedly incompetent employee committed a common law Alabama tort."  *Thrasher v. Ivan*

---

[94] *See, e.g.*, Nichols Declaration, at 7, 27-28.

*Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002) (citing

*Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820, 824 (Ala. 1999)). In *Thrasher*,

the court explained that a plaintiff "cannot maintain an action for negligent

supervision, training, and/or retention based upon conduct that is employment

discrimination, but does not support a common law tort." *See id.*

Nichols has presented no evidence that Stephenson committed a common law

tort. Indeed, Nichols conceded that summary judgment is due to be granted on all

other state law claims. In other words, Nichols admits that there are no other viable

tort claims in this action.[95] Her failure to establish that Ms. Stephenson committed

a common law, Alabama tort is, therefore, fatal to her claim.

Furthermore, another critical element of a negligent hiring and supervision

claim is "proof that the defendants actually knew, or should have discovered in the

exercise of due diligence," that the employee was "likely" to commit the wrong

complained of by the plaintiff. *Sanders v. Shoe Show, Inc.*, 778 So. 2d 820, 824 (Ala.

Civ. App. 2000); *see also Lane v. Central Bank of Alabama, N.A.*, 425 So. 2d 1098,

1100 (Ala. 1983) (noting that, in order to establish a claim for negligent hiring or

supervision, "[l]iability depends upon it being established by affirmative proof that

[the servant's] incompetency was actually known by the master or that, had he

---

[95] Doc. no. 46, at 2 ("Defendant's Motion for Summary Judgment is due to be granted on Nichols' claims of slander, invasion of the right of privacy, and her claim under the ADA.").

exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge"). Here, Nichols has failed to produce evidence raising any genuine dispute that VOA actually knew or should have discovered in the exercise of due diligence that Stephenson was likely to commit a common law tort. Again, Nichols essentially concedes that Ms. Stephenson did not commit a tort. Thus, Nichols's negligent hiring, supervision, or retention also fails on this ground.

In order to establish a wantonness claim, a plaintiff must meet an even more rigorous standard. "In addition to requiring proof that an employer knows or should know that an employee is incompetent, a claim of wanton supervision carries the additional requirement that the plaintiff demonstrate that the employer has 'wantonly disregard[ed] its agent's incompetence.'" *Gardener v. State Farm Mutual Auto Insurance Co.*, 842 So. 2d 1, 10-11 (Ala. Civ. App. 2002) (quoting *Armstrong Business Services v. AmSouth Bank*, 817 So.2d 665 (Ala. 2001)). Nichols has simply not made such a showing, and, therefore, her wantonness claim also fails.

### IV. CONCLUSION AND ORDER

In consideration of the foregoing, defendant's motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice. Defendant's motion to strike is DENIED as moot. Costs incurred herein are taxed to plaintiff. The Clerk is directed to close this file.

DONE and ORDERED this 23rd day of November, 2010.

_____
United States District Judge